## Case No. 18,218.

### ZOLLINGER v. The EMMA.

[3 Cent. Law J. 285; 22 Int. Rev. Rec. 154.] [1]

District Court, S. D. Mississippi.  Jan. Term, 1876.

ADMIRALTY JURISDICTION—MATERIALS FURNISHED AT HOME PORTS—C. O. D. BILLS—LIENS AND MORTGAGES—PRIORITIES.

1. The admiralty jurisdiction of the United States courts in no way depends on the residence, or citizenship of the parties.

2. It is only when liens are given by state laws for materials supplied at home ports that they can be enforced in the admiralty courts.

3. When goods are delivered to the master of a vessel to transport to consignees and collect and return the money therefor, the consignor has a lien against the vessel for the money so collected, since the whole contract is one of affreightment.

[Disapproved in The Illinois, Case No. 7,005.]

4. The master and clerk of a vessel are not entitled to liens for their wages.

5. Maritime liens have priority over mortgages.

[Cited in The J. E. Rumbell, 148 U. S. 18, 13 Sup. Ct. 502.]

In admiralty.

HILL, District Judge. The questions now presented for decision, arise upon the exceptions of the intervenor, Samuel Bazinsky, mortgagee of said steamboat, to the libel and interventions here, and upon exceptions filed by libellant and other intervenors to the claims propounded by John King, master, and J. B. Denny, clerk, Bazinsky & Hirsch, supply-men, and by Forbes & Fitzpatrick, on contract of affreightments.

The exceptions filed by H. H. Miller and Porter, proctors for Samuel Bazinsky, are in substance as follows: (1) That there is no lien for any of the claims propounded, because the Emma was engaged in navigation between two ports of the same state. (2) That there is no averment that the boat is of more than twenty tons burden. (3) That contracts to deliver goods to consignees and return money collected from said consignees, on what are commonly called C. O. D. bills, are not maritime contracts. (4) That there is no jurisdiction in the court, because all of the libellants and owners of the boat are residents and citizens of the state of Mississippi.

The first question is as to the admiralty jurisdiction over vessels plying upon the navigable waters, entirely within the body of the state. On this subject, I do not deem it necessary to review the history of judicial decisions in this country, further than to say that since the case of The Genesee Chief, 12 How. [53 U. S.] 457, it has been the set-

1 [Reprinted by permission.]

tled doctrine, that the ebb and flow of the tide is not the line limiting the admiralty jurisdiction but that it extends to all navigable rivers and waters of the United States. Subsequently in the case of The Magnolia,[2] it was held that the admiralty jurisdiction extended to collisions occurring upon navigable waters entirely within the body of a state. But the case of The Belfast, 7 Wall. [74 U. S.] 624, which has never been overruled, conclusively settles the principle that the admiralty courts have jurisdiction over all maritime contracts, to be performed by, or all torts committed by vessels navigating the navigable rivers and waters of the United States, whether the same be wholly within one state or passing through several states. It is urged by learned counsel for the mortgagee that opinion of the court in that case does not go so far, or that if it does, it has since been overruled in the case of The Lottawanna, 21 Wall. [88 U. S.] 588.

The careful examination of these cases and attentive consideration of the arguments of counsel, have failed to convince me of the correctness of the view taken by counsel. That the rule stated in The Belfast case was intended to fix and settle the admiralty jurisdiction upon all navigable waters of the United States irrespective of state boundaries I have no doubt, and an examination of The Lottawanna will show that this rule has not therein been questioned or disturbed. The sole question in that case, was whether supplies, material and repairs furnished a vessel at her home port, created a lien upon the vessel which could be enforced by a proceeding in rem against the vessel. No question of this sort was raised in The Belfast case [supra]. By the general admiralty law, as enforced in continental Europe, material and supply-men, whether in the home port or a foreign port, have a lien upon the vessel, and a right to proceed in rem. The war made upon the admiralty courts of England, by the law courts, armed with writs of prohibition, restricted this jurisdiction so as to exclude the lien at a home port. The supreme court of the United States, in the case of The General Smith, 4 Wheat. [17 U. S.] 438, adopted the English rule, which the court reaffirms in The Lottawanna case. A modification of the twelfth rule in admiralty was adopted in 1872, and it was thought by several of the courts, and by many of the bar, that its language indicated an intention, upon the part of the court, to overrule former decisions, and hold that there was a lien for supplies and materials furnished at the home port. The court in The Lottawanna case, corrects this view and construes the rule to extend no further than to permit the courts of admiralty to enforce liens given by state laws upon vessels for supplies and materials furnished at the home port. I am

satisfied, therefore, that exception is not well taken, and must be overruled.

As to the exception that it is not averred that the vessel is of twenty tons burden, that is also overruled as it was unnecessary to state it, and if necessary, the defect would have been cured by allegations in exceptor's intervention that she was of more than one hundred tons burden.

The next exception is a jurisdictional one, based upon the residence of the parties. It is sufficient to say that admiralty jurisdiction in no way depends upon the residence or citizenship of the parties. Therefore this exception is overruled.

The other exceptions relate to the character of the several claims set up in the libels and interventions, and may be considered together. A portion of these claims are for seamen's wages, and the jurisdiction of the court having been maintained, there can be no question as to mariner's wages being the first lien upon the boat. The next class of claims is for supplies and materials furnished at the home port. Their character has already been discussed, and counsel representing such claims admit in argument that they can not be sustained as liens unless a lien is given them by the laws of Mississippi. The act of the legislature of Mississippi, March 4, 1874, provides for an attachment against a vessel for supplies and material furnished, and it is evident that this act intended to give an implied lien for such supplies and materials, but I do not think such implied lien can be maintained, and if intended to give a remedy in rem against the vessel enforcible in the state courts, it would be an infringement upon the exclusive admiralty jurisdiction of the United States, and void under the decision of the supreme court in The Belfast case. I hold, therefore, that these claims constitute no lien.

The next and last exception offered by the mortgagee is as to the liability of the vessel in rem, upon what are styled C. O. D. bills, that is where the master of the vessel contracted to deliver goods to the consignees to whom they had been sold, and collect and bring back the price thereof to the shipper. There can be no doubt of the liability of the vessel for the safe transportation and delivery of the goods upon these contracts. The more difficult question is as to the liability of the vessel for the failure of the master to return the money received to the shipper. It is, I believe a settled rule, that where a cargo of goods delivered to a vessel upon a contract that the master shall convey them to some market, and there sell them for account of owner, until he makes a sale and delivers the goods he is acting as the master of the vessel, and not as the agent of the shipper; but that after he sells and receives the money he is agent of the shipper, and consequently that for any breach of contract of affreightment the vessel is liable, but for any default in payment of the

2 20 How. (61 U. S.) 296.

money to the shipper the master is personally liable only. But there is a marked distinction between such a case and one in which the consignor has already sold the goods to the consignee upon an agreement that money is to be paid upon delivery of the goods. In such case, the contract is entirely one of affreightment. The master contracts for a certain sum to be paid as freight to transport the goods to the consignee and transport the money delivered to him by the consignee back to the consignor, or if the money is not placed upon the vessel by the consignee to re-transport the goods themselves to the shipper. The duties assumed are entirely those of a common carrier and a common carrier is as much liable for a failure to transport and deliver money received by him for transportation as he is for a failure to deliver any other character of freight. The immense commercial business now transacted in this way can only be protected by this rule, which can be applied without infringing upon any established principle of admiralty, and is fully sustained in the case of The Hardy [Case No. 6,056], decided by Judge Nelson. The claims so far as proved must therefore be allowed as liens upon the vessel.

I will next consider the exceptions offered by Pittman & Pittman and Gilland & Birchett, for libellant, and intervenors to other claims and interventions filed and set up by the counsel who represents the mortgagee. The first is that of John King, master of the vessel, for his wages as such. The rule that such a claim is not a lien upon the vessel, enforcible in rem, is too well settled to require either reason or authority to sustain it. His contract is with the owner, and only recoverable against him personally. The exception to this claim must be sustained and claim disallowed. The claim of J. B. Denny, first clerk, is also a claim for wages as such, which I am satisfied must be disposed of in the same way. The first clerk of a steamboat is the chief financial agent of the owner, employed by him and accountable to him and not to the master. He receives and disburses all moneys for the boat, pays the wages of the crew, and practically pays the master of the vessel himself his wages, and, having the money of the boat in his own hands, pays his own salary. The reason a lien is given to mariners for their wages is because they are employed by the master of the vessel, on the credit of the vessel, and would in most cases be practically without remedy if they were compelled to hunt up and sue unknown owners. The first clerk does not occupy any such position; he is the financial agent of the owner, and can at all times pay himself out of moneys in his hands, which he receives for freight and passage. I believe the office of first clerk is one unknown to the general admiralty law, according to which the master is the sole representative and agent of the owner. The same principles which exclude the master from the privileges of a mariner's lien, would also be applicable to the first clerk, and upon principle and reason in the absence of adjudicated cases, I am satisfied that first clerks of steamboats are not entitled to a lien for their wages. So the claim must be disallowed. The claim of Bazinsky & Hirsch is for money advanced in the home port, and does not rank any higher than supplies and materials, and must be disallowed. The claim of Forbes & Fitzpatrick is disallowed, because they have obtained judgment against the owner in a state court, and levied upon goods sufficient to pay the debt.

This leaves but one question to settle—the claim of the mortgagee, Bazinsky. It is insisted by his counsel, that his mortgage is a prior and higher than all others. I am satisfied that this position is not maintainable. It is not a maritime lien, but only a lien upon the vessel, subject to all maritime liens. The mortgagee is only allowed to come into court of admiralty as claimant, and occupies exactly the same position that the owner would. His mortgage, from the date of its record, gives him a lien for his mortgage debt, good against all subsequent vendees and incumbrancers, except those holding maritime liens, which are liens in rem, and without regard to the ownership of the mortgage. A vessel is only a conditional sale, and, as an absolute sale or transfer of the title cannot effect maritime liens, a conditional one cannot. To hold otherwise would destroy the credit of vessels, and hamper commerce, beyond reason, for every employé and every shipper and every passenger would have to examine the customhouse records of the home port of the vessel, before he could safely risk his services, his property, or his person upon a boat. This position is fully sustained by all the authorities. Hence the mortgagee can only claim any surplus that may remain after satisfying all of the maritime liens against the vessel.